# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

STEVE OSBORN,

                    Plaintiff,

      v.                                      9:20-CV-673
                                                (TJM/ATB)

DEBORAH HARRIS, et al.,

                    Defendants.

---

STEVE OSBORN, Plaintiff pro se
DAVID H. WALSH, IV, ESQ. for defendants Conklin, Devins, Mosher, and Lalonde

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report-Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In the relevant portions of plaintiff's civil rights complaint, he alleges that the remaining[1] defendants John Doe #1, John Doe #2, Conklin, Devins, Harris, Mosher and Lalonde violated plaintiff's constitutional rights while he was incarcerated in the Oneida County Correctional Facility ("OCCF") between April and June of 2020. (Complaint

---

[1] Plaintiff originally named several other defendants. (Compl. *generally*). However, on initial review of the complaint, Senior Judge McAvoy dismissed many of plaintiff's claims and several of the defendants. (Dkt. No. 10). Although some of plaintiff's original claims were dismissed without prejudice to amendment, he has chosen not to amend and to proceed with the claims that Senior Judge McAvoy allowed to proceed in the initial order. (Dkt. No. 10 at 24-25). The John Doe defendants have not yet been identified, and plaintiff has been advised that he must take reasonable steps to identify and serve the unknown defendant or the case may be dismissed as to those individuals. (Dkt. No. 10 at 25). Plaintiff recently attempted to obtain court assistance in naming these defendants, but was directed that he must endeavor to identify the unknown defendants through discovery and that he must await the outcome of this motion to dismiss. (Dkt. No. 33). If this recommendation is adopted, there will be no necessity to proceed with such identification.

("Compl.") at 7-8, 10, 12-13).

The remaining claims and defendants are as follows:

(1)    First Amendment religion claims against defendants Conklin, Devins, and John Does ##1 and 2.  Plaintiff alleges that these defendants delivered plaintiff's morning Ramadan meal too late for him to be able to eat it. (Compl. at 7-8).

(2)    First Amendment retaliation claims against defendants Harris, Mosher, and Lalonde.  Plaintiff alleges that defendant Harris interfered with plaintiff's April 30, 2020 grievance in retaliation for complaining about the way that Muslim food was being handled. (Compl. at 7-8).  Defendants Mosher and Lalonde gave plaintiff a misbehavior report in retaliation for complaining about a sexual harassment issue. (Compl. at 12).

Presently before the court is the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 25).  Plaintiff has responded in opposition to the motion.  For the following reasons, this court recommends granting the defendants' motion in part and denying motion in part, without prejudice to filing a motion for summary judgment.

# I.    Relevant Facts

Plaintiff alleges that on April 30, 2020, he submitted a "complaint form," objecting to the way that Ramadan[2] food was being handled at OCCF.[3] (Compl. at 7). Plaintiff claims that on May 4, 2020, defendant Harris "sent" him his complaint and told plaintiff that he could either "agree" or "disagree" with her "response."[4]  Plaintiff

---

[2] Ramadan is the ninth month of the Islamic year, observed as sacred with fasting from dawn to sunset. https://www.merriam-webster.com/dictionary/Ramadan.

[3] Plaintiff objected to the religious meals being handled by non-Muslims and explained in his "complaint form" that New York State facilities show Ramadan a great deal of respect, while OCCF was not following the proper law. (Compl. at 7).

[4] Plaintiff does not specify what that response was, but the court assumes that since plaintiff "disagreed" with it, the response did not favor his request.

alleges that he "disagreed," and that he put the complaint form back on "Dep. Blue's"[5] desk. (*Id.*)  Deputy Blue allegedly brought the complaint back to defendant Harris, as is the proper "procedure." (*Id.*)

Plaintiff states that on May 3 and 4, 2020, his Ramadan breakfast was brought to him by the John Doe defendants after daybreak so that plaintiff could not eat it.[6] (Compl. at 7).  On May 5, 2020, defendant Conklin brought plaintiff's Ramadan breakfast too late for him to be able to eat it.  Plaintiff states that he did not say anything to defendant Conklin at the time, instead, he wrote another "complaint" which he sent to defendant Harris. (Compl. at 7).  Plaintiff states that defendant Harris came to see him after he wrote the complaint on May 5, and argued with him about the appropriate time for his breakfast to be brought by the guards.  When plaintiff challenged her opinion about the time, defendant Harris allegedly slammed plaintiff's complaint form on the desk, told plaintiff to sign it and get it back to her, and left the unit. (*Id.*)

Plaintiff alleges that on May 6, 2020, his Ramadan breakfast was delivered by defendant Devins, but it was again too late for plaintiff to eat it. (Compl. at 8)  When plaintiff asked why the meal was late, defendant Devins made some disparaging remarks and walked away.  Later that morning, defendant Harris came to speak with

---

[5] "Blue" is apparently not this deputy's name, and he or she is not a defendant in this case. Plaintiff states that he is "protecting" this deputy by using the pseudonym, "Blue." (Compl. at 7). Plaintiff states that he has used these pseudonyms to protect the officers from retaliation by their co-workers. (Compl. at 8).

[6] It appears that a different officer brought plaintiff's breakfast on each of the two days, resulting in the two John Doe defendants.

plaintiff about his May 5[th][7] complaint. (Compl. at 8).  When plaintiff told defendant Harris that his breakfast had again been brought too late on May 6th, defendant Harris attempted to change the subject by asking plaintiff why he gave away his dinner the night before. (*Id.*)  Plaintiff attempted to explain the situation,[8] but defendant Harris told plaintiff that she did not "give a damn," and started walking away. (*Id.*)  As defendant Harris was walking away, she turned and told plaintiff that his April 30th complaint had "disappeared," and that she could not find it. (Compl. at 8).  Defendant Harris then allegedly smiled and left the unit. (*Id.*)

Plaintiff claims that Dep. Blue, "a good and respectful officer," told plaintiff the he "personally" put the complaint form in defendant Harris's mailbox.  Later in the evening on May 6, 2020, another officer, who plaintiff refers to as "Dep. Good Guy" told plaintiff that defendant Harris said that plaintiff was making her sick and threw his complaint in the trash. (Compl. at 8-9).  Another officer, who plaintiff calls "Dep. Friend" told plaintiff that former defendant Carollo "put the word out" that defendant Harris wanted plaintiff "silenced." (Compl. at 9).  This involved "writing up" plaintiff for "everything." (Compl. at 9).

With respect to defendants Mosher and Lalonde, plaintiff states that, on the morning of May 18, 2020, he told defendant Mosher that he needed to speak with

---

[7] The plaintiff's federal complaint states that defendant Harris brought him his "May 4th complaint," but it is clear from the previous page that he wrote a complaint form on May 5th after his breakfast was late the third time. (Compl. at 7).

[8] Plaintiff apparently has a medical problem which renders him unable to eat spicy food.  He states that he was brought a dinner tray which contained food that he could not eat, so he gave the food to another inmate and was given a misbehavior report for doing so. (Compl. at 7-8).

4

defendant Lalonde about a "P.R.E.A."[9] issue. (Compl. at 12).  Plaintiff states that

defendant Lalonde came to his unit, but left without speaking to plaintiff. (Compl. at

13).  Defendant Mosher told plaintiff that defendant Lalonde was too busy to speak with

him. (*Id.*)  During lunch, another inmate gave plaintiff a piece of cake, but plaintiff

could not eat it because he was fasting, and he wrapped it up to save for later. (*Id.*)

Defendant Mosher apparently witnessed the exchange and gave plaintiff a misbehavior

report, charging him with "trading possessions." (*Id.*)  The report included the statement

that defendant Mosher observed plaintiff taking cake off of a tray during Ramadan.

(Compl. at 12).  Plaintiff states that defendant Mosher wrote the ticket, and that

defendant Lalonde "'found time'" to write it up for him. (Compl. at 13). The court

interpreted plaintiff's complaint as alleging that defendants Mosher and Lalonde issued

the misbehavior report because plaintiff told defendant Mosher that he wished to speak

with defendant Lalonde about a P.R.E.A. issue.[10] (Dkt. No. 10 at 15).


## II.  <u>Motion to Dismiss</u>

To survive dismissal for failure to state a claim, the complaint must contain

sufficient factual matter, accepted as true, to state a claim that is "plausible on its face."

---

[9] "P.R.E.A." stands for the Prison Rape Elimination Act, 42 U.S.C. § 30301 et seq.

[10] These facts may be related to plaintiff's previous statement that on May 18, 2020, he filed a "confidential complaint" against former defendants Delorenzo and Laberta, charging them with sexual harassment and threats, but was told to file a grievance. (Compl. at 12).  Plaintiff stated that, because his complaints often "went missing," he decided to wait until he saw a sergeant rather than filing a grievance. (*Id.*)  This was the introduction to plaintiff's claims against defendants Mosher and Lalonde.  The claims against defendants Delorenzo and Laberta were dismissed in Senior Judge McAvoy's initial order. (Dkt. No. 10 at 20-21) (verbal sexual harassment and threats are not actionable under section 1983).  The retaliation claim against defendants Mosher and Lalonde survived initial review even though the underlying sexual harassment/threats claim did not.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice.  *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).  Plaintiff's factual allegations must also be sufficient to give the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted)*.*

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir 1995).  The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference.  *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).  Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See Kavowras v. New York Times, Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (citing *inter alia County Vanlines, Inc. v.*

6

*Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 154 (S.D.N.Y. 2002) (taking judicial notice of NLRB decisions)).  *See also Combier-Kapel v. Biegelson*, 242 F. App'x 714, 715 (2d Cir. 2007) (taking judicial notice of the Impartial Hearing Officer's decision as well as certain other documents in the administrative record of an IDEA case); *In re Howard's Exp., Inc.*, 151 F. App'x 46, 48 (2d Cir. 2005) (taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity Brokerage Services, LLC*, No. 3:12-CV-1066, 2013 WL 3299708, at *6 (D. Conn. July 26, 2013) (taking judicial notice of record in prior litigation between the same parties).

## III.   Exhaustion of Administrative Remedies

### A.   Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

Grievance programs and procedures in *county* facilities are contained in the regulations governing the New York State Commission of Correction, appearing in the chapter entitled "Minimum Standards and Regulations for Management of County Jails and Penitentiaries," in the part specifically entitled "Grievance Program." N.Y. CODE RULES & REGS. tit.9, §§7032.1-7032.11. These regulations specifically provide that the chief administrative officer of the correctional facility shall establish and maintain a formal inmate grievance procedure. *Id.* § 7032.1. The regulations provide that the facility shall maintain grievance forms for the inmates to use and shall make those forms readily available to inmates. *Id.* §§ 7032.4(d), 7032.6. The regulations also provide that instructions for filing a grievance shall be included in the facility rules and regulations as required by section 7002.9(a)(15), and that "[e]ach inmate at any facility shall be advised in writing as to the availability of grievance forms upon admission." *Id.* § 7032.4(b), (c).

An inmate must file his grievance within five days of the date of the conduct giving rise to the complaint. *Id.* § 7032.4(d). The chief administrative officer of the facility designates a staff member to act as a grievance coordinator, and the regulations

provide that each grievance shall be fully investigated by an individual who was not personally involved in the circumstances giving rise to the grievance. *Id.* § 7032.4(e), (f). The regulations specify minimum requirements for the type of information that must be gathered during the investigation of the inmate's grievance. *Id.* § 7032.4 (g)(1)-(g)(4).

The grievance coordinator must issue a written decision within five business days, containing the "facts and reasons underlying the coordinator's determination," and a copy of the determination must be provided to the inmate. *Id.* at 7032.4(i). The plaintiff may appeal an adverse determination to the chief administrative officer or his designee within two business days of receiving the adverse determination. *Id.* § 7032.4 (j). The chief administrative officer renders a decision within five business days, and if the inmate is still not satisfied, he may appeal the adverse decision directly to the Commission of Correction within three business days. *Id.* §§ 7032.4(k), 7032.5.

Within three business days after receiving the appeal from the inmate, the chief administrative officer of the facility must mail the appeal to the Commission's Citizens Policy and Complaint Review Council ("CPCRC"), and the grievance coordinator must provide the inmate with a receipt of mailing. *Id.* § 7032.5(c). The CPCRC has forty-five days within which to issue a written decision. *Id.* § 7032.5(d). In certain circumstances, inmates will be provided assistance at any stage of the proceedings. *Id.* § 7032.9. The chief administrative officer of the facility must keep a centralized record of all grievances, and facility employees are given an orientation on the grievance

procedures.[11] *Id.* §§ 7032.10, 7032.11.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies.  *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004).  The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement.  *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016).  "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857).  Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid.  The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability.  *Ross*, __ U.S. at __, 136 S. Ct. at 1858.  Courts evaluating whether an inmate has exhausted his

---

[11] The regulations also provide that if an inmate is released or transferred to another facility prior to the resolution of a grievance, the chief administrative officer "shall cause a determination to be made on such grievance . . .", and if the grievance is denied, the chief administrative officer "shall submit the grievance to the [CPCRC] as set forth in section 7032.5 of this Part." 9 N.Y.C.R.R. § 7032.7.

or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles*, 2016 WL 4572321 at *2.  Defendants bear the burden of proving that administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Williams v. Priatno*, 829 F.3d 118, 122, 126 n.6 (2d Cir. 2016).

### B.    Analysis

#### 1.    First Amendment Claims (Conklin, Devins, John Does ##1, 2)

Defendants argue that plaintiff has failed to exhaust his administrative remedies as to his claim that defendants Conklin, Devins and John Does ## 1 and 2 violated his First Amendment rights when they delivered his Ramadan breakfasts too late for him to eat them on four different occasions, from May 3 through May 6, 2020. (Def.s' Mem. of Law at 7-9) (Dkt. No. 25-1).  Defendants argue that the earliest that plaintiff filed a grievance regarding these incidents was May 6, 2020, only 12 to 15 days before he signed his federal civil rights complaint and not enough time for him to complete the exhaustion process.

Although defendants argue that plaintiff signed his complaint on May 18, 2020, there are parts of the complaint in which he discusses incidents occurring in late May and early June 2020.  His complaint was dated June 8, 2020[12] and filed on June 16, 2020. (Compl. at 15) (Dkt. No. 1).  Defendants argue that plaintiff could not have exhausted his administrative remedies in so short a time.  In making this argument, the

---

[12] While the page cited by defendants is dated May 18, 2020 (Compl. at 16), clearly, the complaint was not mailed on that date because the prior page of the complaint is dated June 8, 2020. (Compl. at 15).

defendants fail to cite the regulations upon which they rely, and the cases they cite all refer to the regulations applicable to New York State facilities. *See e.g. Livingston v. Hoffnagle*, No. 9:17-CV-1158 (MAD/DEP), 2019 WL 409366, at *5 (N.D.N.Y. Feb. 1, 2019) (discussing regulations governing the New York State Department of Corrections and Community Supervision ("DOCCS") administrative remedy procedures).

This plaintiff is in a ***county*** facility, and the regulations governing the administrative remedy procedures in such facilities are different than the New York State rules.[13] The initial grievance procedures follow a much shorter time frame for submitting and for responding to grievances. It is true that the ultimate appeal to the CPCRC may take up to forty-five days, 9 N.Y.C.R.R. § 7032.5(d), and therefore it is still unlikely that plaintiff would have had the opportunity to complete the administrative process prior to filing this complaint if the grievance followed the normal procedures.

However, the court must still assess whether the remedies were "available" in the plaintiff's stated situation. Defendant Harris is apparently the individual to whom grievances are initially sent at OCCF, and plaintiff has alleged that defendant Harris "lost" or threw away plaintiff's grievances. In his complaint, plaintiff states that he has been told by other officers that defendant Harris wished to have him "silenced," and that she has told plaintiff herself that she "lost" his April 30, 2020 grievance.[14] In his

---

[13] DOCCS facilities are governed by 7 N.Y.C.R.R. §§ 701.5 et seq., and County facilities are governed by 9 N.Y.C.R.R. §§7032.1-7032.11, as discussed above.

[14] The April 30, 2020 grievance was not regarding the remaining issues in this case, but involved a claim in which plaintiff complained that the Ramadan meals were being handled by non-Muslims.

opposition to defendants' motion to dismiss, plaintiff alleges that he "put in at least (6) complaints" that defendant Harris said she would "forward to Albany,"[15] but that as of October of 2020, he had heard nothing about any of them.[16] (Dkt. No. 34 at 1).

Even though it may be unlikely that plaintiff "completed" the administrative process, if defendant Harris attempted to prevent plaintiff from filing a grievance, his failure to exhaust could be excused even under *Ross*. 136 S. Ct. at 1858 (availability and estoppel are still valid excuses for failure to exhaust - availability is a textual exception and estoppel is a factor in determining availability). Because exhaustion is an affirmative defense, and the burden of proof is on the defendant, a motion to dismiss is inappropriate in these circumstances, particularly when plaintiff is claiming that his ability to file grievances was somehow obstructed by at least one of the defendant's actions. It is true that in the context of a summary judgment motion, plaintiff's general claim that his grievances were lost or destroyed may be insufficient, without more, to excuse his failure to exhaust. *See Abreu v. Miller*, No. 9:15-CV-1306 (TJM/DJS), 2018 WL 5660409, at *7 (N.D.N.Y. Aug. 16, 2018) (citations omitted), *report-recommendation adopted on reconsideration*, 2019 WL 761639 (N.D.N.Y. Feb. 21, 2019). However, in the context of a motion to dismiss, the court must accept the

---

[15] It is unclear to what plaintiff was referring in this statement. The first appeal of a grievance would be decided by the facility's Chief Administrator, and the final appeal is sent to the CPCRC, which has 45 days to respond. 9 N.Y.C.R.R. §§ 7032.4(j), 7032.4(k), 7032.5. *See Dickinson v. York*, 828 F. App'x 780, 783 (2d Cir. 2020) (discussing procedure for appeals of county facility grievances if the grievance is filed and is proceeding through the proper channels).

[16] In his response to the defendants' motion, plaintiff also states that he "complained on the kiosk under special investigations." (Dkt. No. 34 at 2). However, when he met with an investigator, he was told that the investigation could take up to 12 months. (*Id.*) It is not clear to which "complaints" plaintiff was referring.

plaintiff's allegations as true.

Plaintiff claims that he wrote a grievance, or more than one grievance, regarding his meals being brought too late for him to eat them, but that defendant Harris, who appears to be in charge of receiving grievances at OCCF "lost or destroyed" these documents. If the person who is allegedly tampering with the grievances is the individual to which all grievances must be sent in the first instance, exhausting administrative remedies could be impossible. In his response to the motion to dismiss, plaintiff alleges that he wrote to the CPCRC, after defendant Harris told plaintiff that she could not "find" his April 30, 2020 grievance, but that he received no response. (Pl.'s Mem. at 1).

Based on the allegations in the complaint, it is unclear what plaintiff could have done to follow up on any grievances that he unsuccessfully attempted to file. In *Willaims v. Priatno*, the court found that a New York State procedure, providing for an appeal to the next step if there was no response to a grievance, was "unavailable" if a grievance was never "filed." 829 F.3d at 124-27. The same reasoning could apply to grievances that were never "filed" in a county facility. In addition, unlike the New York State regulations governing grievances, the regulations governing county facilities do **not** provide a mechanism for appeal if the inmate does not receive a response a filed grievance.[17] *Compare* 7 N.Y.C.R.R. § 701.6(g)(2), 701.8(g) (allowing an appeal to the

---

[17] As stated above, the circumstances of which plaintiff complained in the April 30, 2020 grievance are not at issue in this case. Rather, plaintiff's allegations about that grievance provide support for his claim that defendant Harris was interfering with plaintiff's grievances. In any event, even the circumstances regarding the April 30, 2020 grievance are unclear. Plaintiff appears to allege that defendant Harris denied the grievance, plaintiff did not accept the denial, and then defendant Harris "lost" it, so that plaintiff's appeal was never sent to "Albany." Either way, it appears, based on

next step if no response is received within the mandated time) *with* 9 N.Y.C.R.R. §§ 7032.4 and 7032.5 (no mention of appeals from grievances with no response).

Given the plaintiff's allegations, the court is unwilling to recommend granting the motion to dismiss based on the affirmative defense of failure to exhaust, even though this action was filed before a decision from CPCRC would have been due, if a grievance appeal regarding plaintiff's Ramadan breakfast had been sent to the CPCRC. I am not addressing the ultimate merits of an exhaustion defense to plaintiff's first claim. Rather, I am only stating my conclusion that defendants cannot prevail based on this defense without further support beyond the scope of the pleadings.

### 2.    Retaliation Claims Against Harris, Mosher, and Lalonde

Plaintiff does not specifically allege that he filed any grievance claiming that defendant Harris retaliated against him for filing grievances about his religious rights by interfering with his later grievances. Nor does plaintiff claim that he filed any grievance against defendants Mosher and Lalonde regarding their alleged retaliation for plaintiff attempting to bring a P.R.E.A. claim. Plaintiff needed to file a separate grievance claiming that the defendants were retaliating against him either by destroying his grievances (Harris) or by issuing misbehavior reports in retaliation for his filing grievances (Mosher & Lalonde). Because defendants Mosher's and Lalonde's alleged retaliation did not occur until late May 2020, and plaintiff filed this action in early June

---

the pleadings, that plaintiff had no recourse if defendant Harris "lost" or "destroyed" his grievance after denying it or if he received "no response" from Albany after he inquired about the grievance. As stated above, it also appears that a step in the grievance procedure could be missing from plaintiff's description. There is no indication that the Chief Administrative Officer of the facility saw the grievance appeal. The Chief Administrative Officer at OCCF is listed as Lisa Zurek. https://scoc.ny.gov/jailadminaddres.htm.

of 2020, it is unlikely that he would have had time to complete the grievance process before he filed the action. Thus, plaintiff has likely failed to exhaust his administrative remedies with respect to the retaliation claims against these three defendants.

However, given that defendant Harris appears to be the individual with whom plaintiff would have to file grievances, if she was interfering with plaintiff's grievances, there is an argument that the grievance process would not be "available" to plaintiff due to the defendants' actions. As stated above, plaintiff appears to allege that he spoke to officers, albeit officers who he declined to identify by name, who told plaintiff that defendant Harris was obstructing his ability to file grievances. This court must accept plaintiff's allegations as true in the context of a motion to dismiss. Without a statement from defendant Harris or any other further support, this court cannot reject the plaintiff's allegations.[18] Therefore, at this time, the court will not recommend dismissal of any of plaintiff's claims based on failure to exhaust. If adopted, this recommendation would not prevent the defendants from making a better-supported argument in a motion for summary judgment.

Defendants have also moved to dismiss both of plaintiff's claims on the merits, notwithstanding the failure to exhaust. The court will turn to a discussion of the merits of plaintiff's claims.

## IV.    First Amendment Religion Claim

### A.    Legal Standards

---

[18]  In his complaint, plaintiff states that on May 18, 2020, defendant Harris told plaintiff that she knew he was suing her, that he would not win, and that Harris was "serving jail justice." (Compl. at 13). Plaintiff claims that on May 23, 2020, an inmate law clerk, named "Thomas" told plaintiff that he was instructed by defendant Harris to take plaintiff's papers and forget he ever had them. (*Id.*)

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citations omitted). In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord*, 758 F.3d 215, 220-22 (2d Cir. 2014). In *Holland*, the court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-

17

21.  The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra* at 274-75; *Ford*, *supra* at 592 (where the court assumed without deciding that the substantial burden test applies)).  The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly.[19]  *Id.*  This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid.  *See also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) (discussing the unsettled status of the substantial burden test).

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests.  *See King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y.  March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274).  Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

---

[19] This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal.  *Holland*, 758 F.3d at 221.

**B.    Analysis**

Defendants argue that plaintiff fails to state a First Amendment claim regarding the late meals because he alleges insufficient facts to establish that the challenged practice of the prison officials infringes upon his religious beliefs to the required extent. (Def.'s Mem. at 10).  Defendants argue that even if plaintiff's food was delivered too late for him to eat for breakfast, there was no indication that he was denied food during the night when he was able to eat or that he was unable to store the food in his cell to save until the sun went down. (*Id.*)  Such conduct was at most a "de minimis" burden on plaintiff's First Amendment rights.  Defendants also ask the court to take judicial notice that on May 6, 2020, the sun rose later than plaintiff claims, making his meal delivery at 5:42 a.m. timely for purposes of Ramadan. (*Id.*)  Thus, at worst, only three of his Ramadan were served too late for him to eat.

In his opposition to defendants' motion, plaintiff specifically alleges that he was not allowed to keep food (other than commissary purchases)[20] in his cell until the evening, and for purposes of the motion to dismiss, the court assumes this to be true. (Pl.'s Mem. at 2).  Thus, plaintiff arguably was not able to eat until his evening meal on four occasions.  Defendants argue that the case law demonstrates that an "isolated" number of meals that do not comply with an inmate's religious requirements or the denial of an "isolated" number of meals are a de minimis burden on the plaintiff. *See DeJesus v. Bradt*, 174 F. Supp. 3d 777, 786 (W.D.N.Y. 2016) (citations omitted).

In 2019, the Second Circuit decided *Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir.

---

[20] Plaintiff also states that his account statements would show that he had not been to the commissary in years. (Pl.'s Mem. at 2).

2019), holding that the district court erred in finding as a matter of law that 10 non-compliant meals constituted a de minimis burden, stating that "it would be absurd to require that courts, in order to determine what constitutes a substantial burden, be made to decide the number of violations of a particular religious tenet that make a sin grievous." However, in *Brandon*, the court also stated that its holding did not preclude finding that "a single meal or a smaller number of meals spread out over a longer period of time might perhaps be considered isolated incidents, such that the burden they impose is de minimis." *Id.* at 36 n.11 (citations omitted).

This is one such instance. Although the improperly provided meals were not "spread out over a longer period of time, plaintiff states that four different individuals brought his breakfast late on four separate occasions in one week. He does not know the names of two of these individuals. Defendant Devins told plaintiff that he was late because he had been "with" plaintiff's girlfriend, a vulgar response to plaintiff's question, but there is no indication that the lateness was intentional. Finally, plaintiff states that he did not even ask defendant Conklin why he was late with his breakfast. Plaintiff does not claim that he had problems with the lateness of his breakfast for the rest of month of Ramadan or that any of the defendants repeated the alleged violation more than once. Thus, this court finds that plaintiff has failed to sufficiently state a First Amendment claim relating to his Ramadan meals from May 3 to May 6, 2020 against defendants Conklin and Devins, and the court will recommend dismissing plaintiff's first claim against all of the defendants.

## V.    <u>Retaliation</u>

### A.    **Legal Standards**

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014)(citations omitted). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord*, 119 F. Supp 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 (2002)). In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Cruz v. Grosso,* No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *6 (N.D.N.Y. May 23, 2014) (citing *inter alia Colon,* 58 F.3d at 873). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his

or her motivation.[21] *Cruz,* 2014 WL 2176256, at *6 (citing *Colon*, 58 F.3d at 872-73). However, temporal proximity alone is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation . . . an inference of retaliation does not arise." *Thomas v. Waugh,* No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at *15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001).

### B.   Analysis

#### 1.   Defendant Harris

Plaintiff alleges that defendant Harris interfered with his grievances in retaliation for previous grievances relating to his religious practices. (Compl. at 7-9, Pl.'s Mem. at 3). Plaintiff also alleges that defendant Harris told other officers that she wanted plaintiff "silenced."[22] (Compl. at 9). Judge McAvoy found that plaintiff's allegations were sufficient to state a claim, and plaintiff has only added to his allegations in his response to defendant's motion to dismiss. Because the court must assume that plaintiff's factual allegations are true, at this stage, the court will recommend denying defendant Harris's motion to dismiss, without prejudice to defendant filing a properly supported motion for summary judgment.

---

[21] This court recognizes the existence of other factors, as discussed in *Colon,* applicable only when the alleged adverse action is the issuance of a misbehavior report.

[22] Plaintiff states that "my complaint from April 20, 2020 going 'missing' and receiving a ticket for giving food to the hungry - which is part of my religion and part of Ramadan is in retaliation for complaining about how Oneida County is treating Muslims during Ramadan . . . ." (Compl. at 9) (emphasis in original). The court notes that plaintiff's complaint about getting a "ticket" for giving food to the hungry was dismissed to the extent that it alleged retaliation against him because there were only conclusory allegations regarding his motives. (Dkt. No. 10 at 15-16). However, Senior Judge McAvoy allowed the retaliation claims to proceed past initial review as they related to defendant Harris.

### 2.    Defendants Mosher and Lalonde

The court does not make the same finding regarding plaintiff's retaliation claims against defendants Mosher and Lalonde.  Plaintiff argues that these defendants retaliated against him by filing a misbehavior report against him for taking cake from another inmate during Ramadan after he told defendant Mosher that he wished to speak with defendant Lalonde about a P.R.E.A. issue. (Compl. at 12-13).  Defendant Mosher told plaintiff that defendant Lalonde was too busy to speak with him, but later that day, defendant Mosher issued a misbehavior report which was "written up" by defendant Lalonde. (*Id.*)

It is unclear even what the protected activity is alleged to be in this situation. Plaintiff states that on May 18, 2020, he told defendant Mosher that he had a P.R.E.A. issue, not that he was filing a complaint.[23] (Compl. at 12).  He stated he wished to speak with defendant Lalonde, but defendant Mosher told plaintiff that defendant Lalonde was too busy to speak with him; but then, defendant Lalonde was not too "busy" to approve the misbehavior report, written later that day by defendant Mosher.  There is no indication from the complaint that either defendant Mosher, or more particularly defendant Lalonde, had any idea of what plaintiff's P.R.E.A. issue was, or who it may have implicated.  In fact, plaintiff admits in the complaint that another inmate gave him a piece of cake, which he wrapped up to save for later. (Compl. at 12).  Neither of these defendants are alleged to have known about any other grievances, nor of any other

---

[23] In fact, plaintiff alleges that he did not write the P.R.E.A. complaint until May 20, 2020, at which time he gave it to defendant Damico, who plaintiff claims mishandled the complaint. (Compl. at 12).  The claims against defendant Damico did not involve retaliation and were dismissed by Judge McAvoy on initial review. (Compl. at 19).

protected conduct in which plaintiff might have been involved.

Generally the court considers "dual motivation," in the context of a motion for summary judgment, where plaintiff has sufficiently alleged a retaliatory motive, and defendants must show that they would have taken the same action without the retaliatory motive. *Yunus v. Jones*, No. 9:16-CV-1282 (GTS/ATB), 2019 WL 5196982, at *4 (N.D.N.Y. June 21, 2019) (citing inter alia *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003)), *report-recommendation adopted*, 2019 WL 4010260 (N.D.N.Y. Aug. 26, 2019). However, in this case, plaintiff has failed to allege that he engaged in protected conduct of which the defendants were aware and has admitted that he committed the violation for which defendant Mosher issued the misbehavior report.[24] Thus, this court will recommend granting the defendants' motion to dismiss as it relates to plaintiff's retaliation claims against defendants Mosher and Lalonde.

## VI.   Qualified Immunity

### A.     Legal Standards

A defendant may establish that he or she is entitled to qualified immunity if she can show that either her actions did not violate clearly established law, or (b) it was objectively reasonable for her to believe that her actions did not violate such law. *M.C. v. Cty. of Westchester, New York*, No. 16-CV-3013 (NSR), 2020 WL 7481023, at *23 (S.D.N.Y. Dec. 18, 2020) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001)). The right is clearly established when "'[t]he contours of the

---

[24] It is unclear from the complaint whether defendant Lalonde actually observed the conduct. Plaintiff states that both defendants "wrote me" a misbehavior report, but plaintiff quotes the misbehavior report as stating that "I [defendant Mosher] observed" plaintiff committing the violation. (Compl. at 12-13).

24

right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013) and citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

A court must consider "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support[s] the existence of the right in question; and (3) whether under preexisting law a reasonable official would have understood that his or her acts were unlawful." *Id.* (quoting *Burns v. Citarella*, 443 F. Supp. 2d 464, 470 (S.D.N.Y. 2006) (citing *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)).

**B.    Analysis**

Defendants argue that they would in any event be entitled to qualified immunity. Because I am recommending dismissal as to all defendants except defendant Harris, I will discuss qualified immunity only with respect to the retaliation claims against her. Plaintiff alleges that defendant Harris tampered with his grievances in retaliation for plaintiff's attempt to complain about the treatment of Muslim inmates. If true, defendant Harris would not be entitled to qualified immunity. It is well-established that the right to complain to public officials and to seek administrative and judicial relief from their actions is protected by the First Amendment. *Id.* (citing inter alia *Franco v. Kelly*, 854 F.2d 584, 588-89 (2d Cir. 1988) (noting that "the right to petition government for redress of grievances as 'among the most precious of the liberties safeguarded by the Bill of Rights.'") Thus, this court will not recommend granting defendants' motion to dismiss based on qualified immunity at this time.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants motion to dismiss (Dkt. No. 25) be **GRANTED IN PART AND DENIED IN PART**, and it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 25) be **DENIED**, with respect to plaintiff's First Amendment Retaliation claim against defendant **Harris**, and it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 25) be **GRANTED** in all other respects as discussed above[25] as against all other defendants,[26] and the plaintiff's complaint **DISMISSED WITHOUT PREJUDICE** as to all other defendants and all other claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated:  January 15, 2021

Andrew T. Baxter
U.S. Magistrate Judge

---

[25] As discussed above, the court would not recommend granting defendants' motion to dismiss to the extent it asserted that plaintiff failed to exhaust available administrative remedies.

[26] The court notes that plaintiff fails to state a claim against the John Doe defendants, but no such defendants have been identified or served.  If plaintiff should attempt to amend his complaint to add any claims, he must also identify and serve the John Does.  Failure to do so may result in the dismissal of plaintiff's complaint "with prejudice" as to the unnamed and unserved defendants.